UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
BARBARA A. SWEDA,

                              Plaintiff,

                                                              **MEMORANDUM & ORDER**

            – against –                                       16-CV-06236 (PKC)

NANCY BERRYHILL,[1]
Acting Commissioner of Social Security,

                              Defendant.

-----------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

    Plaintiff Barbara A. Sweda ("Plaintiff") brings this action under 42 U.S.C. § 405(g), seeking

judicial review of the Social Security Administration's ("SSA") denial of her claim for Disability

Insurance Benefits ("DIB"). The parties have cross-moved for judgment on the pleadings. (Dkts 9,

13.) Plaintiff seeks reversal of the Commissioner's decision and an immediate award of benefits, or

alternatively, remand for further administrative proceedings. The Commissioner seeks affirmation of

the denial of Plaintiff's claims. For the reasons set forth below, the Court grants Plaintiff's motion for

judgment on the pleadings and denies the Commissioner's motion. The case is remanded for further

proceedings consistent with this Order.

## BACKGROUND

## I.     PROCEDURAL HISTORY

    On October 6, 2011, Plaintiff filed an application for DIB, claiming that she has been

disabled since October 1, 2011. (Tr. 157, 306.) [2] The claim was initially denied on February 23,

---

[1] Nancy A. Berryhill became Acting Commissioner of Social Security on January 23,
2017. Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted as
Defendant in this action.

[2] All references to "Tr." refer to the consecutively paginated Administrative Transcript.

2012.  (Tr. 179-182.)  After her claim was denied, Plaintiff requested and appeared for a hearing before an administrative law judge ("ALJ") on January 10, 2013.  (Tr. 47−106.)  By decision dated March 18, 2013, ALJ Hazel C. Strauss found that Plaintiff was not disabled within the meaning of the Social Security Act from October 1, 2011, her alleged onset date, through the date of the ALJ's decision.[3]  (Tr. 154−170.)  On April 3, 2013, Plaintiff requested a review of the decision by ALJ Strauss (Tr. 224−225) and the Appeals Council remanded the claim for a new hearing in an order dated June 3, 2014 (Tr. 175−178).  On September 24, 2015, ALJ Michael Friedman held a second hearing.  (Tr. 107−151.)  By decision dated November 2, 2015, ALJ Friedman found that Plaintiff was not disabled.  (Tr. 19−39.)  On November 6, 2015, Plaintiff requested a review of the ALJ's decision (Tr. 17−18) and the Appeals Council denied the request for review on September 11, 2016 (Tr. 1−5).  Based upon this denial, Plaintiff filed an action in this Court seeking reversal or remand of the ALJ Friedman's November 2, 2015 decision.

## II.    STANDARD OF REVIEW

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits.  42 U.S.C. § 405(g).  In reviewing a final decision of the Commissioner, the Court's role is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quotation omitted).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*,

---

[3] Generally, the ALJ considers whether the claimant was disabled through the date she  last met the insured status requirements of Title II of the Social Security Act.  In this case, however, Plaintiff met the insured status requirements until December 31, 2015.  (Tr. 159.)

402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based upon substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (quotation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If there is substantial evidence in the record to support the Commissioner's findings as to any fact, those findings are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013).

## III. ELIGIBILITY STANDARD FOR SOCIAL SECURITY DISABILITY BENEFITS

To receive DIB, claimants must be disabled within the meaning of the Act. Claimants establish disability status by demonstrating an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). The claimant bears the initial burden of proof on disability status and must demonstrate disability status by presenting medical signs and findings, established by "medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(D). However, the ALJ has an affirmative obligation to develop the administrative record. *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009). This means that the ALJ must seek additional evidence or clarification when the claimant's medical reports contain conflicts or ambiguities, if the reports do not contain all necessary information, or if the reports lack medically acceptable clinic and laboratory diagnostic techniques. *Demera v.*

*Astrue*, No. 12 Civ. 432, 2013 WL 391006, at *3 (E.D.N.Y. Jan. 24, 2013); *Mantovani v. Astrue*,

No. 09 Civ. 3957, 2011 WL 1304148, at *3 (E.D.N.Y. Mar. 31, 2011).

In evaluating disability claims, the ALJ must adhere to a five-step inquiry. The claimant

bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden

in the final step. *Talavera*, 697 F.3d at 151. First, the ALJ determines whether the claimant is

currently engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If the answer

is yes, the claimant is not disabled. If the claimant is not engaged in "substantial gainful activity,"

the ALJ proceeds to the second step to determine whether the claimant suffers from a "severe

impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is determined to be severe when it

"significantly limits [the claimant's] physical or mental ability to do basic work activities." 20

C.F.R. § 404.1520(c). If the impairment is not severe, then the claimant is not disabled within the

meaning of the Act. However, if the impairment is severe, the ALJ proceeds to the third step,

which considers whether the impairment meets or equals one of the impairments listed in the Act's

regulations (the "Listings"). 20 CFR § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P,

App. 1. If the ALJ determines at step three that the claimant has one of the listed impairments,

then the ALJ will find that the claimant is disabled under the Act. On the other hand, if the claimant

does not have a listed impairment, the ALJ must determine the claimant's "residual functional

capacity" ("RFC") before continuing with steps four and five. The claimant's RFC is an

assessment which considers the claimant's "impairment(s), and any related symptoms . . . [which]

may cause physical and mental limitations that affect what [the claimant] can do in the work

setting." 20 C.F.R. § 404.1545(a)(1). The ALJ will then use the RFC determination in step four

to determine if the claimant can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If

the answer is yes, the claimant is not disabled. Otherwise the ALJ will proceed to step five where

the Commissioner then must determine whether the claimant, given the claimant's RFC, age, education, and work experience, has the capacity to perform other substantial gainful work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the answer is yes, the claimant is not disabled; otherwise the claimant is disabled and is entitled to benefits. *Id.*

## IV.   RELEVANT FACTS AND MEDICAL RECORDS

From June 1982 until April 2010, when the hospital where she worked closed, Plaintiff worked as a respiratory therapist. (Tr. 353.)

In 1960 or 1961, Plaintiff was diagnosed with juvenile myoclonic epilepsy. (Tr. 471.) Plaintiff was placed on Primidone and, according to neurologist Dr. Kyusang Lee, who last saw Plaintiff in October 2014 (Tr. 648), "has done well since then" (Tr. 471). In 1996, Plaintiff was formally diagnosed with systemic lupus and started working part-time because of her fatigue. (Tr. 623.) On May 9, 2005, Plaintiff visited Dr. Lee who stated that Plaintiff "rarely gets myoclonic seizures (about once a month if she is fatigued). She denies any other types of seizures." (*Id.*) Dr. Lee noted that Plaintiff, in relevant part, denied focal weakness, numbness, unsteady gait, "persistent joint pains", "persistent rash", depression, or anxiety. (Tr. 472.) Her mental status and motor exams were normal, with Plaintiff demonstrating "5/5 strength throughout." (*Id.*) Plaintiff saw Dr. Lee again on December 20, 2006; Plaintiff reported that her seizures, epilepsy, and migraines were under control. (Tr. 469.) On September 8, 2008, Plaintiff again saw Dr. Lee. Her migraines were stable although she "experience[d] them cyclically, about every 6-8 weeks" and they were "diffuse and severe." (Tr. 467.) Her exam was otherwise unremarkable and her strength was 5/5 throughout. (*Id.*)

On April 22, 2010, Plaintiff was laid off due to her employer's bankruptcy. (Tr. 353.) On September 13, 2010, Plaintiff visited Dr. Lee again. Her migraines continued to be stable and no

other problems were reported. (Tr. 465.) On July 14, 2011, Plaintiff visited dermatologist Dr. Diana Sun for blisters on her hands that she had had for three weeks. (Tr. 503.) Plaintiff visited Dr. Sun again on July 18, 2011 for her blisters, which were "itching" and "bleeding." (Tr. 504.) She was diagnosed with eczema and prescribed ointment and told to use rubber gloves. (*Id.*) On August 25, 2011, Dr. Sun diagnosed Plaintiff with porphyria cutanea tarda[4] (Tr. 459-60) and bulbous dermatitis (Tr. 505.) On September 1, 2011, Plaintiff returned to Dr. Lee because she was getting new blisters. (Tr. 507.) On September 28, 2011, Plaintiff visited her gynecologist, Dr. Salvatore Ancona, who found that Plaintiff had no "rashes, new or changed lesions, bruising, or itching." (Tr. 544.) Dr. Ancona also found no psychiatric history. (Tr. 576.)

Plaintiff alleges that her disability began on October 1, 2011. On October 10, 2011, Plaintiff had a follow-up appointment with Dr. Lee due to "healing blisters on both hands". (Tr. 463.) Plaintiff's exam was otherwise normal, and Dr. Lee told her to follow up in a year. (*Id.*) On October 26, 2011, Plaintiff visited rheumatologist Dr. Harry Fischer. He reported that Plaintiff "denied any joint pain" and "ha[d] no tenderness or swelling of any joints." (Tr. 552.) Plaintiff's skin did "reveal some healed areas on her hands, but no active blistering lesions." (*Id.*)

On October 28, 2011, Plaintiff submitted a Function Report in connection with her disability claim. She stated that she had scabs on her hands due to porphyria, which made it difficult to wash dishes and her hands, bathe, and carry groceries. (Tr. 340-41.) She further stated that it was difficult for her to do heavy lifting and that she could not squat or kneel. (Tr. 344-45.) Additionally, she noted that she got shortness of breath while climbing stairs and could only walk

---

[4] Porphyria cutanea tarda is a type of skin disorder in which affected individuals are sensitive to sunlight and where minor trauma to the skin may cause blister formation. http://www.webmd.com/a-to-z-guides/porphyria-cutanea-tarda (last accessed January 2, 2018)

about three blocks before needing to rest. (Tr. 345-46.) Finally, she wrote that she "intermittently" had stiff and aching joints that lasted between two weeks and a month. (Tr. 347-48.)

On November 8, 2011, Dr. Fischer reported that Plaintiff "[was] doing well" and that Plaintiff "thinks maybe the lesions are less, maybe less blistering since being discontinued from being on chlorthalidone." (Tr. 554.) She had "some small blistering skin lesions on her hands, but no other rashes", joint pain, or swelling, and her pain level was 0 out of 10. (*Id.*)

On November 12, 2011, Dr. Sun submitted a Disability Report in connection with Plaintiff's DIB application. (Tr. 522.) She noted that she had been seeing Plaintiff monthly since July 2011 for her porphyria and that Plaintiff "had residual superficial erosions and crusts, but no further blisters" since her last visit. (Tr. 523.) She stated that Plaintiff's prognosis was "uncertain presently" and that her work "may be limited by the erosions or blisters that occurs on her skin." (*Id.*)

On November 17, 2011, Plaintiff's nephrologist, Dr. Alan Dubrow, submitted a Disability Report in connection with Plaintiff's DIB application. Dr. Dubrow stated that he first saw Plaintiff in February 2006 and saw her every three to six months. (Tr. 527.) He noted that her diagnoses were: diffuse proliferative lupus nephritis,[5] hypertension, creatinine clearance, and porphyria cutanea tarda. (Tr. 527.) He stated that her symptoms included: occasional dizziness, skin rash with blisters on her fingers, musculoskeletal back pain with exertion, and "[e]arly fatiguability". (Tr. 527, 529.) He found that her prognosis was "slow progression over time". (Tr. 528.)

---

[5] Lupus nephritis is an inflammation of the kidneys that is caused by systemic lupus erythematous (SLE, an autoimmune disease). https://www.webmd.com/lupus/lupus-nephritis#1 (last accessed January 2, 2018).

On May 3, 2012, Dr. Sun submitted a Disability Report in connection with Plaintiff's DIB application.[6] She stated that she saw Plaintiff every two to four weeks since July 2011. (Tr. 592.) She stated that Plaintiff's diagnosis was bullous disease[7] and systemic lupus erythematosus[8]. (*Id.*) She noted that Plaintiff had skin lesions on her left and right hands that have persisted for at least three months despite treatment. (Tr. 592-93.) Furthermore, she stated that Plaintiff had flare-ups of "bleeding, itching, pain[,] swelling" in her hands and fingers (Tr. 594) "every two weeks" that took "1.5 weeks" to resolve (Tr. 593). Dr. Sun concluded that Plaintiff's prognosis was "[p]oor. Bullous disease is a chronic condition. It was initially thought to be related to one of her medications, but the lesions persist despite discontinuing the alleged offending medication." (Tr. 592.)

On June 19, 2012, Dr. Kenneth Glass of the Dallas Disability Process Unit submitted a Case Analysis. He stated that he agreed with the first ALJ decision that "[t]he claimant's impairments do not limit [her] ability to engage basic physical demands of simple work on a sustained basis despite the limitations resulting from [her] impairments. A fully favorable determination[9] is not supported. However, without any additional information the evidence does

---

[6] On February 22, 2012, a "M. Steadman" completed a Physical RFC Assessment regarding Plaintiff. (Tr. 531-35.) It is not clear who this individual is, and his or her RFC assessment is not addressed in the ALJ's decision or either party's brief. Therefore, the Court disregards it.

[7] Bullous disease is an autoimmune, chronic skin disorder characterized by blistering. https://www.webmd.com/skin-problems-and-treatments/bullous-pemphigoid (last accessed January 2, 2018).

[8] Systemic lupus erythematosus is a chronic autoimmune disease. https://www.webmd.com/lupus/systemic-lupus-erythematosus#1 (last accessed January 2, 2018).

[9] A "fully favorable determination" means that the SSA has found the claimant is disabled as of the date of onset alleged. Social Security Handbook, *How to Read and Understand the Initial Determination*, Social Security Administration (Jan. 22, 2008), https://www.ssa.gov/OP_Home%2Fhandbook/handbook.05/handbook-0527.html.

not support a reduced RFC. A fully favorable decision cannot be made at this time." (Tr. 538.) On July 19, 2012, Plaintiff had an appointment with Dr. Fischer. He noted that Plaintiff had a blistering skin lesion and scarring, but "[h]er skin is well under control". (Tr. 588.) He also noted no tenderness, swelling, or pain in her joints. (*Id.*)

At the January 10, 2013 hearing before ALJ Strauss, Plaintiff testified that after she was laid off in 2010, she had three short-term jobs. She also stated that she worked for three days at a nursing home in 2010, but that they let her go because "[t]hey told me I couldn't keep up." (Tr. 65-66.) She also worked three weeks at a hospital in 2011, but was fired after three weeks because she "couldn't keep up with the job responsibilities." (Tr. 66.) She said that she would "slow down" when responding to patients, had a hard time using stairs, and had trouble remembering information on patient charts. (Tr. 72-73.) She also worked in a short-term position in 2012 for 30 days, but she was again let go because "[t]hey told me I couldn't keep up the job responsibilities" (Tr. 53, 111) and "due to the fatigue that I experience[,] I wasn't able to perform the duties as required" (Tr. 53, 67). Plaintiff also testified that "the lethargy that [she] experience[d] from the medications that [she was] taking" made her unable to work (Tr. 55) and that it had "gotten worse over the last several years" (Tr. 57) to the point that she had to rest or take naps in the afternoons (Tr. 71).[10] She acknowledged, however, that she had received unemployment benefits from 2010 until December 2012 because she "was attempting to look for work." (Tr. 64-65.) She also testified to having joint pain (Tr. 57, 75-76), pain in her left thigh due to shingles (Tr. 58, 67), cataracts (59-60), and blisters on her hands (Tr. 74, 75, 100).

---

[10] As of the January 10, 2013 hearing, Plaintiff was taking Toprol, Macridis, Ramipril, and Amlodipine for hypertension; chlorthalidone as a diuretic; Xanax for anxiety; CellCept for immunosuppression (Tr. 55-56); Mysoline/primidone for epilepsy (Tr. 59); and Prednisone for lupus (Tr. 71). (*See also* Tr. 355-56, 392-93.)

Plaintiff saw Dr. Fischer again on January 16, 2013. She had no lesions and reported "[n]o increasing joint pains or skin changes." (Tr. 684.) On January 22, 2013, Plaintiff began seeing Dr. Donna Edwards, an internist, to oversee her care and centralize the treatment from her various specialists. (Tr. 732.) Dr. Edwards noted that Plaintiff "ha[d] not been able to hold a job due to lupus condition impairing her performance" (*id.*) and that Plaintiff stated that "she feels fatigue/medical condition impairs work" (Tr. 733). Dr. Edwards found that Plaintiff was "[p]ositive for fatigue/weakness—[patient] has difficulty getting out of bed in the morning and falling asleep, in bed about 8 [hours] but gets up to go bathroom". (Tr. 734.) Dr. Edwards further found that Plaintiff had moderate depression, but did not have any pain or swollen joints. (Tr. 732, 734.) On January 31, 2013, Plaintiff had a bone density scan which revealed a significant decrease in the density of her lumbar spine. (Tr. 752.) On February 14, 2013, Plaintiff visited Dr. Edwards again. She noted that Plaintiff still had depressive symptoms and was referred to a psychiatrist. (Tr. 731.) She was also referred to physical therapy for her "lupus and weakness in extremities, osteopenia." (*Id.*)

On March 4, 2013, Plaintiff saw neurologist Dr. Maryana Skliut for an epilepsy evaluation, after being referred by Dr. Edwards. (Tr. 748.) Plaintiff reported "chronic fatigue" as well as "depression and anxiety mostly because of lot of personal stress. Joint pain [which was a 2 out of 10], pain in the left thigh and having difficult [time] of walking because of that." (Tr. 749.) On March 28, 2013, Plaintiff saw Dr. Edwards. Plaintiff had "some improvement" with her depressed mood but "still [had] fatigue and joint aches[,] no significant change in these symptoms" although her pain was 0 out of 10. (Tr. 728-29.) Dr. Edwards noted that Plaintiff "has not been able to keep multiple jobs in past due to lupus condition." (Tr. 728.)

On April 3, 2013, Dr. Edwards submitted a Multiple Impairment Questionnaire. She stated that Plaintiff's symptoms included fatigue, joint pain, depression, and "susceptibility to viral illness". (Tr. 600.) Plaintiff rated her pain as ranging from 3 to 7 out of 10 and her fatigue as being 9 out 10. (Tr. 601.) Dr. Edwards found that Plaintiff could, in a typical workday, sit for up to four hours and stand or walk up to one hour and would need to take unscheduled breaks during the day as well as an unscheduled absence one day per month. (Tr. 601-02, 604-605.) Dr. Edwards also noted that Plaintiff's "depressive symptoms that combine with existing fatigue with lupus" could affect the severity of Plaintiff's symptoms. (Tr. 604.) In response to the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?", Dr. Edwards checked "constantly." (*Id.*) Dr. Edwards stated that Plaintiff's prognosis was that "[p]atient condition impairs ability to function at prior jobs and overall poor prognosis as patient continues to age, and has lupus nephritis/renal HTN." (Tr. 599.) On June 11, 2013, Plaintiff saw Dr. Edwards again for prescription refills. Plaintiff reported that she "continue[d] to have joint aches", but that her pain was 0 out of 10. (Tr. 726.)

On July 7, 2013, Dr. Nicholas Harbord, a nephrologist who had been treating Plaintiff since February 2013, submitted a Multiple Impairment Questionnaire. He noted that Plaintiff's reported that her pain was 7 out of 10 and her fatigue was 6 out of 10. (Tr. 610.) He also stated that her symptoms included "chronic lumbar back pain with some acute exacerbations; fatigue; immunosuppression with risk of infections" (Tr. 609), and that she would need to be absent from work more than three times a month due to her impairments/treatment (Tr. 614). He concluded that Plaintiff's prognosis was "[g]ood (kidney function expected to remain sufficient to prevent dialysis need)." (Tr. 608.)

On August 28, 2013, Plaintiff saw Dr. Steven Meed, a rheumatologist, for a consultation. He found that

> [Plaintiff] has been unable to work since 2010. The main limitations have been her profound fatigue and multiple medical exacerbations. She cannot work for more than 2 hours at a time because of fatigue that lasts through the next several days, and she must take multiple absences because of flares of her illness. While currently controlled by medications, her condition is subject to frequent flares and exacerbations. Her prognosis is for ongoing disease activity and disability for the foreseeable future.

(Tr. 624.) In a Lupus Impairment Questionnaire dated the same day, Dr. Meed stated that Plaintiff was "fully disabled since 2010" and met the full diagnostic criteria for systemic lupus. (Tr. 616-17.) He also noted that her symptoms included: abdominal pain, fatigue, depression, ankle swelling, trouble sleeping, rash (bilateral arms/hands), arthralgia, and arthritis with joint involvement, Raynaud's phenomenon,[11] chest pain, and anemia. (Tr. 618-19.) He checked "frequently" in response to the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?", and circled "fatigue". (Tr. 620.) He concluded that Plaintiff "[c]ould not sustain an 8 [hour] day, even w[ith] breaks" and would need to be absent more than three times per month due to her impairments/treatments. (Tr. 621.)

On September 11, 2013, Plaintiff saw Dr. Fischer. Plaintiff "report[ed] she generally feels well" and had no pain or swollen joints. (Tr. 679.) On October 25, 2013, Plaintiff saw Dr. Abigail Chen, an internist, for pain in her left hip. (Tr. 723.) She saw Dr. Chen again on November 14, 2013. Plaintiff "admit[ted] to being depressed" because of "difficulty with [her] job situation and applying" since she "[felt] fatigue/medical condition impair[ed] [her ability to] work." (Tr. 721.)

---

[11] Raynaud's phenomenon is an impairment of blood circulation to the extremities. https://www.webmd.com/arthritis/tc/raynauds-phenomenon-topic-overview#1 (last accessed January 2, 2018)

Plaintiff also reported having leg pain, but her pain was 0 out of 10. (*Id.*) Plaintiff was referred to a psychiatrist. (*Id.*) When Plaintiff visited Dr. Chen on December 12, 2013, Plaintiff reported "feel[ing] much better emotionally" due to her medication, although she was still experiencing back pain and "[felt her] fatigue/medical condition impair[ed her ability to] work." (Tr. 716-17). In a follow-up visit on January 10, 2014, Plaintiff reported feeling "[n]ot depressed or agitated." (Tr. 713-14.) On February 21, 2014, Dr. Chen diagnosed Plaintiff with depressive disorder and unspecified insomnia. She was referred again to psychiatry. (Tr. 711.)

In a follow-up visit with Dr. Edwards on June 24, 2014, Plaintiff reported no pain and no rashes. (Tr. 708, 710.) On July 2, 2014, Plaintiff saw Dr. Hirotaka Koto, a general practitioner, at Beth Israel Medical Center. She reported no joint pain, swelling, rashes, anxiety, depression, pain, or sleep disturbances. (Tr. 705.) On October 10, 2014, Plaintiff had an appointment with Dr. Fischer, who noted that Plaintiff had "no manifestation of lupus. She has had no rashes. . . . No joint pains or swelling." (Tr. 675.) On October 15, 2014, Plaintiff saw Dr. Lee, who noted that when Plaintiff was fatigued, she "can experience occasional myoclonic seizures." (Tr. 648.) On December 1, 2014, she reported no pain, swelling, or stiffness of joints during her appointment with Dr. Fischer. (Tr. 672.) During another follow-up visit with Dr. Fischer on February 23, 2015, Plaintiff reported that she was "doing well" with no rashes and "some joint pain at times, but these have also [gone] quite down." (Tr. 668.) On March 11, 2015, Plaintiff had an unremarkable follow-up with Dr. Edwards. (Tr. 698.) During a bone density scan on April 7, 2015, Plaintiff was diagnosed with osteopenia and had a "significant interval decrease in the bone mineralization of the lumbar spine." (Tr. 652, 743.)

On May 19, 2015, Plaintiff met with an agency consultative examiner, Dr. Arturo Caesar. Plaintiff reported that her pain was 7 out of 10. (Tr. 640.) Dr. Caesar found that Plaintiff was not

in acute distress, that her skin was normal, that her depression was controlled by medication, that her joints were "stable and nontender", and that she had full grip strength and full strength in her extremities. (Tr. 642-43.) He stated that Plaintiff's prognosis was "fair" and "[b]ased on this examination, the claimant is able to sit, stand, climb, push, and carry heavy objects. She has moderate limitation squatting." (Tr. 643.)

On August 26, 2015, Dr. Edwards submitted a second Disability Impairment Questionnaire. She noted that Plaintiff was disabled as of October 1, 2011 and Plaintiff's symptoms included "generalized body aches and fatigue" with pain that was "dull", "generalized", "almost constant", and "aggravated by movement, relieved by rest." (Tr. 656.) She stated that, in a typical workweek, Plaintiff can only sit for four hours per day, stand/walk for two hours, must take unscheduled breaks at "unpredictable" intervals, and would need to be absent more than three times per month due to her impairments/treatment. (Tr. 657-59.) Dr. Edwards checked "frequently" in response to the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?" (Tr. 658.) On August 26, 2015, Plaintiff had a follow-up appointment with Dr. Edwards. She noted that Plaintiff had "[n]o complaints today other than chronic generalized bodyaches and fatigue." (Tr. 695, 697.)

On September 17, 2015, Dr. LaCheryl Smith, Plaintiff's psychiatrist, submitted a Mental Impairment Questionnaire. She stated that she had started treating Plaintiff on January 6, 2014 and saw her every other week. (Tr. 757.) Dr. Smith noted Plaintiff had dysthymia[12] caused by the loss of her husband. She stated that Plaintiff's symptoms included irritability and social withdrawal, but that none of her symptoms were "frequent or severe." (Tr. 758-59.) However,

---

[12] Dysthymia is mild, chronic depression.
https://www.webmd.com/depression/guide/chronic-depression-dysthymia#1 (last accessed January 2, 2018)

Dr. Smith noted that Plaintiff had marked limitations in understanding and memory, concentration and persistence, social interactions, and adaptation as well as moderate limitations in completing a workday without psychological symptoms. (Tr. 760.) Dr. Smith stated that Plaintiff would need to be absent less than one day a month due to her impairments/treatment. (Tr. 761.) On September 18, 2015, Dr. Smith submitted an additional letter as part of Plaintiff's DIB application. She stated that Plaintiff

> Complained of depressed mood, trouble sleeping, and expressed hopelessness and irritability. She also had multiple life stressors including being terminated for difficulty keeping up at work and her husband was terminally ill. . . . [But] [f]eels less depressed on medication and is better able to cope with daily life issues, and is less irritable. About a year after the loss of her husband, therapy sessions were cut back to every other week as Ms. Sweda was feeling better and also had other medical issues that were worsening. Overall, Ms. Sweda's condition has mostly responded to medication and therapy.

(Tr. 755.)

On September 24, 2015, Plaintiff testified at her second ALJ Hearing. She stated that she was receiving a pension from her deceased husband, but had no other income in 2013 through 2015 because her unemployment benefits were "cut off". (Tr. 110, 111, 333.) She reiterated that she had three unsuccessful work attempts. (Tr. 111.) She also testified that she considered lupus her "most serious" condition. "It has various effects on my body. Sometimes it's my joints, muscles, tendons, my eyes" (Tr. 112) and that the joint pain "comes and goes. It's not something that can be defined within a certain period of time" (Tr. 127-28). Plaintiff testified, however, that she no longer had lesions on her skin and that the pain in her left thigh had gotten better. (Tr. 114.) She stated that she can stand for an hour and sit for about two hours but that she "[has to] constantly keep getting up and down because I'm so stiff." (Tr. 118.) She further testified that there were "no days" where she has to stay in bed or could not leave her apartment. "I'm able to go out and

perform my duties. Go shopping. I don't have anybody to help me so I have to do what I have to do." (Tr. 115.)

On June 15, 2016, Plaintiff had a consultation with Dr. Theodore Fields, a rheumatologist. He stated "ongoing issues causing disability" included Plaintiff's" fatigue, joint pain[,] [o]steoarthritis hands[,] [l]ikely osteoarthritis knees" (Tr. 8) and that they dated back to October 1, 2011 (Tr. 14). He further stated that Plaintiff's "fatigue, leg muscle pain and joint pain, with difficulty concentrating, prevent her from returning to work." (*Id.*; *see also* Tr. 7 ("Fatigue was the issue, along with pain, at times very severe in hands. The fatigue would not permit her to work now.").) Dr. Fields also completed a Lupus (SLE) Impairment Questionnaire, in which he stated that Plaintiff suffers from "severe fatigue" and cannot be seated for more than three hours and stand/walk for more than three hours. (Tr. 11-12.) He further stated that Plaintiff would need to be absent more than three days a month due to her impairments/treatment (Tr. 14) and would need to take unscheduled breaks multiple times per day (Tr. 13). Finally, he noted that a competitive work environment would cause her fatigue to worsen and he checked "frequently" in response to the question, "How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration?". (*Id.*)

## V.    THE ALJ'S DECISION

The ALJ's November 2, 2015 decision followed the five-step evaluation process established by the SSA to determine whether an individual is disabled. (Tr. 24-39.) At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity since her alleged onset date (October 1, 2011). (Tr. 24.) While Plaintiff worked after the alleged disability onset date, the ALJ found that the $1,657.34 earned in 2012 was an unsuccessful work attempt. (Tr. 25.) At step two, the ALJ determined that Plaintiff suffered from systematic lupus erythematosus, renal

hypertension, and chronic renal insufficiency and cognitive delays, which qualified as severe impairments. (*Id.*) The ALJ determined that Plaintiff's impairments of eye floaters and cataracts, urinary tract infections, juvenile epilepsy, and depression are non-severe. (Tr. 25-26.)

At step three, the ALJ determined that Plaintiff's impairments, either individually or in combination, did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 27.) In reaching this determination, the ALJ considered Listing 14.02 ("Systemic lupus erythematosus"), and specifically found that Plaintiff's impairment did not meet those listing because "the claimant's doctor visits showed that her medication was generally controlling her lupus symptoms." (*Id.*) In addition, the ALJ also determined that Plaintiff's impairment of renal function did not meet the requirements as the "claimant's treating doctor opined in July of 2013 that the claimant's kidney function was good." (*Id.*)

Having determined that Plaintiff's impairment did not meet or medically equal any of the impairments in the Listings, the ALJ determined Plaintiff's RFC, finding that Plaintiff was able to perform the "full range of light work as defined in 20 CFR 404.1567(b)." (Tr. 27.) The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 32.) However, the ALJ found that the "objective medical evidence [did] not support a finding that the claimant is as limited as alleged." (*Id.*) The ALJ acknowledged that his determination of Plaintiff's RFC did not accord with Plaintiff's own description of the intensity, persistence, and limiting effects of her symptoms. (Tr. 32-33.) In the course of determining Plaintiff's RFC, the ALJ also gave little weight to the medical opinions of Drs. Meed, Harbord, Edwards, and Sun, as well as the state agency doctors. (Tr. 34−37.)

At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (Tr. 37.) However, the ALJ determined at step five, based on the vocational expert's testimony

and Plaintiff's age, education, work experience, and RFC, that Plaintiff "acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." (Tr. 37-38.) The ALJ subsequently concluded that Plaintiff was not disabled from the alleged onset date (October 1, 2011) through the date of the ALJ's decision (November 2, 2015) as defined in the Social Security Act. (Tr. 38.)

## DISCUSSION

Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence in finding that Plaintiff has no severe mental impairments and failed to determine Plaintiff's physical RFC. (Dkt. 10, at 15-25.)[13] Plaintiff also argues that the ALJ failed to properly evaluate Plaintiff's credibility, and that the Appeals Council failed to properly consider new evidence. (*Id.* at 25-30.) For the reasons stated below, the Court finds that the ALJ committed reversible error in evaluating Plaintiff's statements concerning the intensity, persistence, and functionally limiting effects of her symptoms. Furthermore, the Court finds that the ALJ's error in this regard is grounds for remand to further develop the record and issue a new decision, as explained more fully herein.[14]

Although the ALJ thoroughly considered Plaintiff's claims regarding the pain caused by her lupus (Tr. 32-37), the ALJ did not sufficiently evaluate Plaintiff's complaints of fatigue. Allegations of fatigue are "a symptom that needs to be assessed." *Sarchese v. Barnhart*, No. 01-CV-2172(JG), 2002 WL 1732802, at *7 n.5 (E.D.N.Y. July 19, 2002). The ALJ's findings on this issue were inexplicably inconsistent. On the one hand, the ALJ found that although "the claimant

---

[13] Page numbers refer to the pagination generated by the Court's CM/ECF system, and not the document's internal pagination.

[14] Because the Court reverses and remands on these grounds, the Court need not address Plaintiff's other arguments.

had . . . fatigue due to lupus[,] . . . the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible."  (Tr. 32.)  Yet, despite finding Plaintiff's subjective complaints of fatigue "not entirely credible," the ALJ gave Dr. Harbord's opinion about Plaintiff's ability to work "some weight", even though "it was based largely on the claimant's allegations of subjective fatigue."  (Tr. 35.)  And, in giving "little weight" to the state agency doctors' opinion that Plaintiff had "minimal work limitations," the ALJ himself relied on the fact that "the medical record show[s] that the claimant . . . was easily fatigued from lupus." (Tr. 37.)  In light of the fact that the ALJ explicitly found that Plaintiff was "easily fatigued" by her lupus, it is not clear to the Court how the ALJ could then conclude that Plaintiff's description of her fatigue was "not entirely credible."  Furthermore, the ALJ's finding that Plaintiff's treatment for lupus was "relatively conservative" and "controlled with medication" (Tr. 32-33) cannot be applied to Plaintiff's complaints of fatigue, since she alleges it is the medications themselves that are partially responsible (Tr. 55).

Under 20 C.F.R. § 404.1529, an ALJ must accept the Plaintiff's statements of the debilitating effects of her fatigue to the extent those statements are "reasonably consistent with" all of the evidence.  Beyond showing that a medical impairment could reasonably be expected to cause the symptoms of which the applicant complains—which Plaintiff showed in this case, according to the ALJ (Tr. 32)—an applicant has no burden to further "substantiate" or "support" her subjective statements of fatigue, *see Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) ("[The Claimant's] allegations [of the limiting effects of her symptoms] need not be substantiated by medical evidence, but simply consistent with it.  The entire purpose of § 404.1529 is to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." (citing *Hogan v. Astrue*, 491 F. Supp. 2d 347, 353 (W.D.N.Y. 2007))).

During both of her ALJ hearings, Plaintiff testified about the impact of her fatigue on her ability to work. While the ALJ counts against Plaintiff the fact that she kept looking for work from April 2010 until December 2012 (Tr. 33, 64-65), he does not consider the fact that she testified that she was ultimately fired from all three of her work attempts "due to chronic fatigue" (Tr. 25, 53, 67). Furthermore, it would be perverse to, in effect, punish a claimant for attempting to continue working; indeed, the Court finds that Plaintiff's desire to work and her earnest efforts to find work bolster her credibility with respect to the debilitating and incapacitating effects of her medical conditions. Plaintiff also testified that "the lethargy that [she] experience[d] from the medications that [she was] taking" made her unable to work (Tr. 55) and that it had "gotten worse over the last several years" (Tr. 57) to the point that in she had to rest or take naps in the afternoons (Tr. 71). In addition, Dr. Meed noted during his consultation that Plaintiff said she had started working part time as early as 1996 "because of fatigue." (Tr. 623.)

And even though Plaintiff's subjective claims of fatigue need not be substantiated by medical evidence, here, the available medical evidence does so. *See Rockwood v. Astrue*, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009) (citing SSR 96-7P ("[A]n individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone.")). For example, Dr. Dubrow noted in November 2011 that Plaintiff's lupus symptoms included "early fatiguability." (Tr. 529.) Plaintiff similarly reported that "she feels fatigue/medical condition impairs [her ability to] work" to Dr. Edwards in January 2013 and August 2015 (Tr. 697, 733), and to Dr. Chen in November and December 2013 (Tr. 716-17, 721). Additionally, it is also unclear how the ALJ found that the "objective findings" (Tr. 35) do not correlate with Dr. Edwards's April 2013 report that Plaintiff's fatigue was at a level of 9 out of 10 (Tr. 601), but nonetheless gave "some weight" to Dr. Harbord's July 2013 opinion that Plaintiff's

fatigue was 6 out of 10 (Tr. 610). Thus, the ALJ committed legal error by discounting Plaintiff's statements, as well as the consistent medical evidence in the record.

## CONCLUSION

For the reasons set forth above, the Court grants Plaintiff's motion for judgment on the pleadings and denies the Commissioner's cross-motion. The Commissioner's decision is remanded for further consideration consistent with this Order. The Clerk of Court is respectfully requested to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: Brooklyn, New York
        January 2, 2018